UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RHODA SHAW, by and through her Guardian and Conservator, Cynthia A. Beck; LAWRENCE D. BECK; and CYNTHIA A. BECK,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT SHAW; DEANNA FOX SHAW; THOMAS SPADE; and BARBARA SPADE,<br><br>Defendants. | Case No. 2:24-cv-00107-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are cross motions for summary judgment filed by Defendants Robert Shaw and DeAnna Fox Shaw (Dkt. 45) and Plaintiffs (Dkt. 46). Both parties seek summary judgment on Plaintiffs' conversion and unjust enrichment claims. The Court held a hearing in this matter on May 7, 2026. Dkt. 64.

Upon review, and as explained in more detail below, the Court GRANTS both Motions IN PART. The Becks are awarded summary judgment on the first two elements of unjust enrichment. The Shaws' Motion is GRANTED insofar as it seeks exclusion of the Becks' expert witness. In all other respects, the Motions are DENIED.

## II. BACKGROUND

This case arises out of an intrafamily real estate dispute. Plaintiffs are family

MEMORANDUM DECISION AND ORDER - 1

matriarch Rhoda Shaw by her guardian and daughter, Cynthia A. Beck, Cynthia personally, and Cynthia's husband Larry (collectively "the Becks"). The Becks are suing Robert "Bobby" Shaw (Rhoda's son and Cynthia's brother), Bobby's wife, DeAnna ("the Shaws"), and Rhoda's sister, Barbara Spade, and her husband, Thomas (together with the Shaws, "the Defendants").

Rhoda Shaw owned a duplex in Sandpoint, Idaho (the "Property"). Prior to the events of this case, she deeded a one half interest in the property to Bobby Shaw as tenant in common. Bobby lived in one half of the duplex year-round. Rhoda, Cynthia, and Larry lived in Arizona during the winters and, during the summers, they stayed in the other half of the Property. Over the years, the Becks spent several thousand dollars improving the Property.

In 2014, Cynthia considered divorcing her husband, Larry. She sought help from her aunt, Spade, who showed her how to access her credit report. Cynthia input her social security number and generated a report on Spade's computer, which she asked Spade to save in case she needed it later. Cynthia did not divorce Larry.

Sometime in mid-2020, Rhoda began to show signs of cognitive impairment. About this time, Spade allegedly showed the Shaws Cynthia's credit report and told them details about Larry's financial situation. According to the Becks, Bobby became fearful that the Property was at risk of tax foreclosure due to Larry Becks' unpaid taxes and other debts.

In August 2021, Rhoda executed a quitclaim deed which transferred her remaining interest to Bobby Shaw. The Becks were outraged. Cynthia Beck sought and secured

MEMORANDUM DECISION AND ORDER - 2

appointment as Rhoda's conservator, whereupon she filed an action to quiet title on Rhoda's behalf in Bonner County District Court, seeking to void the August 2021 transfer.

While the quiet title action was pending, the Shaws moved onto the portion of the Property typically occupied by Rhoda and the Becks, boxed up the Becks' possessions, and moved them to storage at various locations on the Property. The Becks allege the Shaws improperly stored their possessions, leading to weather and rodent-related damage. The Becks threatened a lawsuit related to their chattels, leading the Shaws to demand the Becks remove their chattels from the Property. The Becks, believing the Shaws did not lawfully own the Property in fee, refused.

After a four-day bench trial, the Shaws prevailed in the quiet title action. However, the Bonner County District Court rejected the Shaws' counterclaim for trespass related to the Becks refusal to remove their chattels. The Court concluded that the Becks could not be liable for trespass because they left their chattels on the Property under color of title, thus lacking the necessary intent to commit trespass. Cythia appealed, and the Idaho Supreme Court affirmed. *Shaw v. Shaw*, 2026 WL 1970686 (Idaho July 8, 2026).

The Becks filed this suit on February 23, 2024, five days before the state court bench trial in the quiet title action. Dkt. 1. They alleged that Barbara and her husband Thomas unduly influenced Rhoda to sign the quitclaim deed; that Barbara tortiously interfered with their privacy by publicly disclosing private facts regarding their financial situation to the Shaws; that the Shaws are unjustly enriched by the value of their improvements to the Property; and that the Shaws converted their chattels. *Id.* at 11–15.

MEMORANDUM DECISION AND ORDER - 3

In its previous Memorandum Decision and Order, Dkt. 53, the Court granted Thomas Spade's Motion to Dismiss, finding that all claims against Thomas Spade were precluded by the state court judgment. The Court also granted an Amended Motion to Amend the complaint, which removed a tort claim and clarified a few other allegations.

After the Becks moved to amend, but before the Court granted Thomas Spade's Motion or the Amended Motion to Amend, the parties cross moved for summary judgment. Dkts. 45; 46. The parties responded (Dkts. 47; 48; 49) and replied (Dkts. 50; 51; 52).

The Court held a hearing on the cross Motions on May 7, 2026. Dkt. 64. Because the Court identified possibly unbriefed controlling authority—namely, the Idaho Supreme Court's opinion in *Asher v. McMillan* discussing the scope of unjust enrichment—the Court ordered supplemental briefing. The parties filed the requested briefs on May 14, 2026. Dkts. 65; 66.

The matters are now ripe for review.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation modified). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Id.*

The movant has the initial burden of showing through the pleadings, depositions, answers, admissions, and (potentially) affidavits that no genuine issues of material fact exist as to a challenged claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden if it can point to a legal defect in the nonmovant's theory, competent evidence contradicting the nonmovant's claims, or (if the nonmovant bears the burden of proof on the challenged issue) the nonmovant's inability to produce evidence supporting its claims in discovery. *See id.*, *see also Bosse v. I.D.O.C.*, 2021 WL 1820639, at *2 (D. Idaho May 5, 2021).

If the movant carries its initial burden, the burden shifts to the nonmovant to come forward with evidence tending to prove the challenged claim. *Id.* at 322–23. If the nonmovant does so, the burden shifts back to the movant to show that the nonmovant's evidence does not create a genuine issue of material fact. To secure summary judgment, the movant must show that the nonmovant's evidence is insufficient to prove at least one essential element of its claim at trial. *Celotex*, 477 U.S. at 322–23.

The standard applicable to motions for summary judgment does not generally change if the parties file cross motions. *See, e.g.*, *Cady v. Hartford Life & Accidental Ins.*, 930 F. Supp. 2d 1216, 1223 (D. Idaho 2013). However, the Court must evaluate each party's motion on its own merits. *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## IV. DISCUSSION

### A. Undue Influence

The Shaws ask the Court for summary judgment on the Becks' undue influence

MEMORANDUM DECISION AND ORDER - 5

claim against Bobby Shaw. Dkt. 45-1, at 6–7. However, in its Order dismissing Thomas Spade (Dkt. 53), the Court granted the Becks' Amended Motion to Amend. Dkt. 42. The parties agree that the operative Second Amended Complaint removed the undue influence allegations. *See also* Dkt. 63. Accordingly, the Court finds the Shaws' request for summary judgment on the Becks' undue influence claim MOOT.

## B. Unjust Enrichment

The Becks claim to have improved the Property by, among other things, drilling a new well, rebuilding a pumphouse, installing new fencing and a new dock, installing a concrete patio, beach sand, a carport, and a storage shed; and upgrading the bathroom, insulation, appliances, upstairs, and flooring. Dkt. 45-2, at ¶ 11. Now that the Shaws own the Property, the Becks claim the Shaws are unjustly enriched. Both parties seek summary judgment on the Becks' unjust enrichment claim.

Under Idaho law, there are three elements for unjust enrichment: "(1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof." *Med. Recovery Servs., LLC v. Bonneville Billing & Collections, Inc.*, 336 P.3d 802, 805 (Idaho 2014). The Becks seek summary judgment on the first two elements of unjust enrichment, while the Shaws seek summary judgment on the third. The Shaws also argue the Becks' action is untimely.

### 1. Inequitable Retention

The Shaws argue it would not be inequitable for them to retain the benefit of the

MEMORANDUM DECISION AND ORDER - 6

improvements to the Property because the Becks voluntarily improved the Property in the expectation of benefitting themselves and their children.

Under the officious intermeddler rule, a plaintiff who voluntarily confers an unsought benefit with full knowledge of the facts cannot generally show inequitable circumstances. *See Kenworth Sales Co. v. Skinner Trucking, Inc.*, 454 P.3d 580, 586 (Idaho 2019). Relatedly, parties usually cannot recover in unjust enrichment when the party's effort to advance its own self-interest incidentally benefit others. *Brown v. Yacht Club of Coeur d'Alene, Ltd.*, 722 P.2d 1062, 1066 (Idaho Ct. App. 1986) ("[R]ecovery for unjust enrichment is unavailable if the benefits are created incidentally by a party pursuing his own advantage."); *see also Cuevas v. Barraza*, 277 P.3d 337, 344 (Idaho 2012) ("the alleged recipient must also be the intended beneficiary.").

The Shaws argue that "a person cannot . . . recover money which he or she has voluntarily paid with full knowledge of all the facts, and without fraud, duress, or coercion . . . ." Dkt. 45-1, at 9 (quoting *Chinchurreta v. Evergreen Mgmt., Inc.*, 790 P.2d 372, 374 (Idaho Ct. App. 1989)). The Shaws further argue there is no dispute the Becks were aware they had no legal right to the Property when they made their improvements, and there are no allegations of fraud, duress, or coercion; thus, they argue the officious intermeddler and intended beneficiary rules bar the Becks' claim.

The Becks counter that the Shaws overstate the officious intermeddler rule's scope, pointing out that "[a] person is not an intermeddler if such person has a valid reason for conferring the benefit, such as protecting an interest." Dkt. 49 at 15 (quoting *Curtis v. Becker*, 941 P.2d 350, 354 (Idaho Ct. App. 1997)). The Becks also point out that Idaho

MEMORANDUM DECISION AND ORDER - 7

allows restitution in case of mistakes of fact, which suggests the intended beneficiary rule of *Brown* and *Cuevas* is stated too broadly. *See* Dkt. 49, at 15–16.

At oral argument, the Court asked the parties about *Asher v. McMillan*, an unbriefed case. In *Asher*, the Idaho Supreme Court held that, if an unjust enrichment

> claimant makes expenditures to maintain, improve, or add value to property that the claimant reasonably expects to retain or to acquire, and (because such expectation is frustrated) another person becomes the unintended beneficiary of the claimant's expenditure, the claimant is entitled to restitution from the other as necessary to prevent unjust enrichment.

503 P.3d 172, 177 (Idaho 2021) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 27). The Idaho Supreme Court went on to hold that a reasonable expectation of ownership is a "valid reason" under *Becker*. *See Asher*, 503 P.3d at 178–79. The parties obliged the Court's request for supplemental briefing on whether *Asher* controls. The Becks argue it does. *See* Dkt. 66.

The Shaws argue *Asher* is distinguishable because *Asher* (and the cases on which it relied) involved a landlord-tenant relationship. Dkt. 65, at 1. The Court disagrees. In *Asher*, the parties reached an oral agreement under which McMillan would purchase and restore a home in exchange for the Ashers' agreement to rent from McMillan for five years before purchasing the home. 503 P.3d at 175. The *Asher* court found that agreement gave the Ashers' a reasonable expectation of ownership. *Id.* at 178–79. But it was the *expectation of ownership*, not the fact that it emerged out of a rent-to-own relationship, that was legally significant:

> The Restatement lists ten commonly recurring situations in which unrequested benefits may form the foundation for an award of restitution—including improvement of another's property with the expectation of

MEMORANDUM DECISION AND ORDER - 8

> ownership. . . . Here, the district court expressly rejected McMillan's argument that the Ashers were officious intermeddlers and found that 'although McMillan never specifically asked for the improvements, the Ashers had a valid reason to confer the benefit—the improvements were made in contemplation that the Ashers would own the property after five years.'

*Id.* at 179. Although this situation is factually distinguishable from *Asher*, the distinction is not legally material because it does not call into question whether the Becks had a valid reason to expect ownership. *Cf. Becker*, 941 P.2d at 354.

The comments to the Restatement (Third) of Restitution § 27 (quoted in full and relied on by the Idaho Supreme Court in *Asher*) reinforce the principle that the touchstone for its application is whether a party had a reasonable expectation of future ownership rather than how that expectation arose. Illustration 12 to § 27 reads:

> Mother tells Son that if he will construct an addition to her house, she will allow him to live in it and convey the property to him before her death. Son makes the requested improvements at a cost of $35,000, increasing the value of the property by a like amount. Repudiating her promise to Son, Mother sells the house to Daughter for one dollar. Daughter evicts Son from the premises. Mother's promise to convey to Son is unenforceable. Son has a claim against Daughter under this section to recover $35,000, secured by an equitable lien on the house.

Restatement (Third) of Restitution § 27 cmt. *e*, illus. 12. Similarly, comment *f* acknowledges "[a] consistent pattern of decisions allowing restitution to insurance beneficiaries and prospective heirs (see Illustrations 19-20) [which] may at first seem surprising, in view of the manifestly contingent nature of the interests these claimants act to protect." *Id.* at cmt. *f*. Illustration 20, in turn, reads:

> Father and Mother hold Blackacre as tenants by the entireties, subject to mortgage. Father leaves the marital home and makes no further contribution to the support of the family. Some years later, Mother asks Children to take

MEMORANDUM DECISION AND ORDER - 9

over the mortgage payments, and Children make the scheduled payments until Mother's death. Father acquires Blackacre by survivorship and takes steps to sell the property. Whether or not Children have a claim against Father by the rule of § 22(2), their interest in Blackacre as the prospective heirs of both parents justifies their intervention to pay the mortgage debt. Children have a claim against Father under this section to recover the amount of their payments, plus interest, secured by an equitable lien on the sale proceeds.

*Id.* at cmt. *f*, illus. 20. Together, the illustrations and comments to § 27 indicate that an individual who improves property subject to a belief in future ownership which is reasonable under all the circumstances may be entitled to restitution. Rent-to-own agreements may give someone a reasonable expectation of ownership, but they are not the only circumstances which indicate a reasonable expectation of ownership. *Asher*, therefore, controls.

The Shaws argue that, even if a landlord-tenant relationship is not necessary to establish a reasonable expectation of future ownership under *Asher*, the Becks had none here. At the hearing, the Becks pointed to Rhoda Shaw's will, filed at Dkt. 29-8 at 27–32, which they interpret as making any bequests regarding the Property conditional on Rhoda surviving her children (i.e., Bobby Shaw and Cynthia Beck). The Shaws dispute that reading of the will, and point to affidavits of Bobby and DeAnna Shaw indicating Rhoda always intended the Property to pass to Bobby.

There appears to be a genuine dispute of material fact on whether the Becks had a reasonable expectation of future ownership. There is some uncertainty as to who was entitled to take under the terms of Rhoda's will, *compare* Dkt. 42, at ¶ 11 *with* Dkt. 45-2, at ¶ 13, but Cynthia Beck is one of Rhoda's prospective heirs under Idaho's intestate succession act. Idaho Code § 15-2-103(a). The Court finds that a reasonable factfinder

MEMORANDUM DECISION AND ORDER - 10

could reject the Shaws' testimony and infer from Rhoda's will and the Becks' testimony that the Becks had a reasonable expectation of future ownership. If the Becks convince the factfinder that they reasonably expected, under all the circumstances, to acquire the Property in the future, and if the remaining elements of recovery under *Asher* are met, they will be entitled to restitution to the extent that equity requires.[1]

The intended beneficiary rule does not bar the Becks' claims for the same reasons the Becks are not officious intermeddlers under *Asher*. *Asher* was issued in 2021 and explicitly contemplated unjust enrichment in cases where a party incidentally benefits another party by improving property the claimant expects to own. 503 P.3d at 177 ("and (because such expectation is frustrated) another person becomes the *unintended beneficiary* of the claimant's expenditure, the claimant is entitled to restitution from the other as necessary to prevent unjust enrichment.") (emphasis added). *Asher* cannot be squared with language in *Cuevas* (issued in 2012), which states that "the alleged recipient must also be the *intended beneficiary*." 277 P.3d at 344 (emphasis added). Either *Asher* states an exception to *Cuevas* or overrules it; in either case, *Asher* controls.

*2. Timeliness*

The Shaws next argue any improvements made prior to February 23, 2020, are time

---

[1] The Shaws further argue Bobby Shaw objected to at least some of the improvements, and that the evidence indicates at least some of the improvement's benefit to the Property was intended as a gift to the Shaws. Although this may be a valid defense at trial, it is not a reason to give the Shaws summary judgment. If the factfinder determines the Shaws have been unjustly enriched, it will have to further determine the extent to which equity requires restitution. In making that determination, the factfinder will be entitled to consider whether improvements were made over the Shaws' objections and how much the improvements increased the value of Rhoda's half of the Property (as opposed to the Shaws' half, over which the Becks could not have had a reasonable expectation of future ownership).

MEMORANDUM DECISION AND ORDER - 11

barred because the applicable statute of limitations (the limitations period for oral contracts) provides a four year period and the action accrued when the improvements were made. They discuss *Templeton Patents, Ltd. v. J.R Simplot Co.*, 220 F. Supp. 48 (D. Idaho 1963), which held that an unjust enrichment claim for unlicensed use of a patent accrued when the benefit was conferred or, at the latest, when the plaintiff became constructively aware of the defendant's unlicensed use.

The Becks agree their unjust enrichment action is subject to a four-year limitations period but argue the action accrued when Rhoda Shaw transferred her ownership to Bobby Shaw. They argue their cause of action did not accrue until the transfer because only then were all the elements of unjust enrichment met.

The Becks are correct. The general rule on accrual is that an action does not accrue until all of the elements of the cause have occurred and the plaintiff has a right to recover. *VanRenselaar v. Batres*, 575 P.3d 866, 884 (Idaho 2025). Prior to the transfer to Bobby, there was nothing inequitable about Rhoda's retention of the Becks' improvements because the Becks (allegedly) had a reasonable expectation of future ownership. Once their expectation of ownership was frustrated, however, they obtained a colorable claim to unjust enrichment. Nor would the Becks have had a cause of action against the Shaws until the Shaws enjoyed the benefit of the improvements, and that did not occur (allegedly) until they took an ownership interest with value enhanced by the improvements.

*Templeton* does not contradict this rule. In *Templeton*, the court held the limitations period began to run when Simplot began using the patented process without a license; there, the moment Simplot began to benefit from the process, it was unjust. 220 F. Supp. at 50–

MEMORANDUM DECISION AND ORDER - 12

52. Here, the benefit was (allegedly) conferred *before* the retention became unjust. *See Asher*, 503 P.3d 177–79. Under standard limitations principles, the limitations period for all improvements began to run in September of 2021. The Becks filed in February 2024. The unjust enrichment action is, therefore, timely.

Because the Becks have raised a genuine dispute of material fact as to whether they reasonably expected to own the Property in the future, and because their action was timely, the Shaws' Motion for Summary Judgment is DENIED with respect to the final element of unjust enrichment.

### 3. Conferral and Appreciation of Benefit

The Becks seek summary judgment on the first two elements of unjust enrichment; namely, "(1) there was a benefit conferred upon the defendant by the plaintiff; [and] (2) appreciation by the defendant of such benefit." *Med. Recovery Servs.*, 336 P.3d at 805. There is no genuine dispute that the Becks improved the Property, nor is there any dispute that whatever increase in value those improvements caused is now enjoyed by the Shaws. *See* Dkt. 45-2, at ¶¶ 9–12. The Court, therefore, finds the Becks are entitled to summary judgment on the first two elements of unjust enrichment.

### C. Conversion

After Rhoda signed her interest over to Bobby, Bobby and DeAnna boxed the Becks chattels left on their half of the Property and moved them into storage. The Becks claim the Shaws improperly stored the chattels, leading to damage from rodents and the elements, and that the Shaws are therefore liable for conversion.

The Shaws ask the Court for summary judgment on the Becks' conversion claim

MEMORANDUM DECISION AND ORDER - 13

because the Becks will not be able to introduce admissible testimony on the fair market value of their chattels. Specifically, the Shaws ask the Court to exclude the testimony of the Becks' expert, Roger Howson, because he was not properly disclosed, and they argue the Becks cannot testify to the value of their own chattels, either. The Becks, for their part, ask the Court to find the Shaws liable for conversion as a matter of law. The Court GRANTS the Shaws' Motion to the extent it seeks a ruling excluding the Becks from using Howson's testimony; both motions are DENIED in all other respects.

### 1. Testimony on Fair Market Value

Rule 26(a)(2) requires expert disclosures to be made "at the times and in the sequence that the court orders" and requires the disclosure of retained experts to include several categories of information. Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Although parties can supplement a disclosure, supplemental disclosures are used to correct errors or backfill gaps in an incomplete report created by discovery of new information unavailable at the time of the initial report. *Krause v. Cnty. of Mohave*, 459 F. Supp. 3d 1258, 1269 (D. Ariz. 2020). An untimely supplement which exceeds the scope of the timely disclosure or incorporates unused but previously available data does not cure the deficiencies in the prior report. *Id.*, *see also Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1239–40 (W.D. Wash. 2018); *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 881 (C.D. Cal. 2013) ("The duty to supplement 'does not give license to sandbag one's

MEMORANDUM DECISION AND ORDER - 14

opponent with claims and issues which should have been included in the expert witness'
[original] report.'" (insertion in original)).

Rule 37(c)'s exclusion sanction is self-executing. *Yeti by Molly, Ltd. v. Deckers
Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). The party failing to comply with Rule
26 bears the burden of showing the failure was substantially justified or harmless. *R & R
Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1246 (9th Cir. 2012). Rule 37(c)
sanctions have been upheld even when it has the practical effect of precluding a cause of
action or defense. *Yeti*, 259 F.3d at 1106. When imposing case-dispositive sanctions,
however, the Court must consider whether the noncompliance suggested willfulness, fault,
or bad faith, and—upon request of the sanctioned party, *see Merch. v. Corizon Health, Inc.*,
993 F.3d 733, 741–42 (9th Cir. 2021)—whether lesser sanctions are available. *R & R Sails*,
673 F.3d at 1247.

Under Rule 26(a), "The report must contain: (i) a complete statement of all opinions
the witness will express and the basis and reasons for them; (ii) the facts or data considered
by the witness in forming them; (iii) any exhibits that will be used to summarize or support
them; (iv) the witness's qualifications, including a list of all publications authored in the
previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the
witness testified as an expert at trial or by deposition; and (vi) a statement of the
compensation to be paid for the study and testimony in the case." Fed. R. Civ. P.
26(a)(2)(B)(i)–(vi)

Here, the report of Roger Howson lacked any real statement regarding his opinions
or the basis therefore, lacked any facts or data, and did not include the exhibits to be used

MEMORANDUM DECISION AND ORDER - 15

to summarize or support his findings.[2] The first Howson disclosure is, therefore, deficient under Rule 26(a).

The Becks do not argue their timely disclosure was sufficient; instead, they ask the Court to find good cause to grant relief from the scheduling order because they were diligent and any prejudice to the Shaws would be minimal.[3] Although they frame the arguments in terms of Rule 16 good cause, Rule 37(c) provides the governing standard for excusing a failure to timely and sufficiently disclose an expert witness. Rule 37(c) requires exclusion of expert testimony absent a showing of substantial justification or harmlessness. Fortunately, the Becks' arguments regarding "good cause" and "prejudice" are easily analyzed under Rule 37(c).

The Becks failure to timely comply with Rule 26 was not substantially justified. The Becks filed this action in February 2024. The Court entered a stipulated scheduling order on June 6, 2024, which set the Becks' deadline for expert disclosures for October 14, 2024, with all expert discovery to be completed by December 13, 2024. Dkt. 20. The Becks

---

[2] The disclosure, in full, reads: "I am an independent and public adjuster licensed in the state of Washington, President of ClaimSimple, LLC, and CEO and President of Claims Dispute Resolution, Inc.. I have over 47 years of experience in the insurance industry and have acted as an adjuster since 1980. A full list of my qualifications and a list of all other cases in which I have testified as an expert at trial or by deposition since 2009 is attached to this report, as is a Fee Schedule stating the compensation Plaintiffs will pay for my study and testimony in this case. I will express the opinion that the Shaws improperly stored the Becks' chattels in 2023 and 2024 and damaged the chattels in a certain monetary amount. In forming these opinions, I will consider facts and data supplied to me by Brandi Hollibaugh, a private professional adjuster who inspect [*sic*] the Becks' chattels in October 2024. To summarize or support my opinions, I will use the facts and data supplied by Ms. Hollibaugh as an exhibit, including a report detailing the results of her inspection. This report will be supplemented once Ms. Hollibaugh's report is complete in order to more specifically state the opinions I will express and the facts, data, and exhibits I will rely upon." Dkt. 39, at 5.

[3] The Becks note the Shaws have not moved for discovery sanctions or an order in limine excluding their expert's testimony. Because the Rules explicitly permit the Court to consider the admissibility of evidence in determining whether there is a genuine issue of material fact, *see* Fed. R. Civ. P. 56(c)(2), the Court can appropriately consider the admissibility of expert testimony on a motion for summary judgment.

MEMORANDUM DECISION AND ORDER - 16

obtained access to their chattels in late July 2024, and only then began the search for an expert. The Becks retained Howson on September 13, one month before the deadline. Howson inspected the chattels on October 4. The Becks filed a timely, but deficient, disclosure on October 12. The Shaws represent they chose not to retain an expert due to the perceived insufficiency of the October 12 disclosure.

Howson delivered his report on December 10, adding more detailed calculations of the replacement value of the chattels. The Becks supplemented two days later—December 12, one day before the close of expert discovery. The Shaws propounded discovery regarding Howson on December 30 and requested to depose Howson and Cynthia Beck on January 2, 2025. The Becks rejected those requests on January 24, 2025, based on the December 13, 2024, closure of expert discovery. Sometime in February 2025, The Shaws notified the Becks that they would seek to exclude Howson's testimony based on substantive irrelevance of the replacement value testimony described in the December 12 supplement. The Becks then served a second supplemental disclosure with fair market value calculations and offered to make Howson available for deposition. The Becks never asked Defendants or the Court for an extension of the scheduling order.

Under that timeline, the Becks' failure to timely disclose a compliant expert report is not substantially justified. The Becks had several months to solicit experts before and after they obtained access to their chattels. Even if one counts only from the date they gained access to their chattels, the Becks still had months to obtain an expert report. Yet they failed to do so until the month before the deadline. Although the Becks state they had difficulty identifying an expert, they do not disclose the steps they took or otherwise show

MEMORANDUM DECISION AND ORDER - 17

that they were incapable of moving faster, and in any case, they never solicited the Shaws or the Court for an extension. The Becks have the burden of showing they were incapable of complying with the discovery deadline as would substantially justify their failure to timely disclose, and they have not carried it.

Nor was their failure harmless. The Becks failed to make a facially compliant expert disclosure until after the Shaws' expert disclosure deadline had passed. The Shaws were not obligated to undertake the expense of hiring an expert when the Becks failed to timely and adequately disclose an expert, merely on the off-chance the Becks would "cure" the report with an untimely supplement. Permitting the Becks to use their expert would, therefore, prejudice the Shaws, who lack a rebuttal expert and have not deposed Howson.

The Becks argue they disclosed their intent to obtain an appraisal in July 2024, but the Shaws never attempted their own appraisal, so *perhaps* the Shaws would not have hired a rebuttal expert in time even if the Becks had timely and sufficiently disclosed Howson. But the Becks have the burden of showing harmlessness, and speculation regarding what the Shaws might have done had the Becks fulfilled their discovery obligations does not carry that burden.

The Court must, therefore, determine the appropriate sanction. By default, Rule 37(c)(1) requires exclusion.[4] The Court is not obligated to consider another sanction when the offending party does not ask for one. The Court, therefore, ORDERS the testimony of Roger Howson excluded under Rule 37(c).

---

[4] For reasons explained in more detail below, exclusion here is not claim dispositive. The Court does not, therefore, need to undertake the more rigorous analysis required by *R & R Sails*. *See* 673 F.3d at 1247.

MEMORANDUM DECISION AND ORDER - 18

The above analysis notwithstanding, owners of property are generally competent to testify as to the value of their property. The Shaws argue the Becks cannot testify as to the value of their chattels because they were not identified as witnesses in initial disclosures.[5] The Becks argue they identified themselves as having knowledge of the "nature and quantity" of their lost chattels, which covers value. They also argue that Ninth Circuit case law precludes the Shaws' argument.

In *Liberty Ins. Corp. v. Brodeur*, the Ninth Circuit held that a witness who has been properly identified in an initial disclosure under Rule 26(a) cannot be excluded under Rule 37(c)(1) from testifying to matters beyond the scope noted in the initial disclosure. 41 F.4th 1185, 1190–91. The Becks cannot be excluded from testifying regarding the value of their chattels based on the initial disclosures having been narrower in scope. They were properly identified, and any concern that they might testify beyond the scope of their initial disclosures would not, standing alone, warrant exclusion.[6] The Court cannot, therefore, determine that the Becks are incompetent to testify to the fair market value of their chattels at this time.

Therefore, the Shaws' Motion for Summary Judgment is DENIED except insofar as it seeks exclusion of Roger Howson's testimony.

---

[5] In reply briefing, the Shaws further argue the Becks refused to be deposed without elaborating on the circumstances for that refusal. Because the lack of a deposition does not itself prohibit a witness from testifying, the Court will not exclude the Becks' testimony on fair market value of chattels without the benefit of sufficient argument that the circumstances for their refusal to be deposed require exclusion.

[6] The Shaws ask the Court to strike a timeline from the Becks' response on the grounds that it is irrelevant to this action. In the exercise of its discretion, the Court denies the Shaws' request. Although there may be irrelevant information in the timeline, the Court can distinguish relevant from irrelevant information, and the added context is helpful for understanding the sequence of events in this procedurally intricate case.

MEMORANDUM DECISION AND ORDER - 19

*2. Plaintiffs' Case in Chief*

The Becks ask the Court to find the Shaws are liable as a matter of law for converting their property. The Shaws object that conversion requires "an intentional exercise of dominion or control which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel," which is a genuinely disputed, fact-laden determination based on several factors.[7] Dkt. 47, at 5.

There are three elements of conversion in Idaho: "(1) that the charged party wrongfully gained dominion of property; (2) that property is owned or possessed by plaintiff at the time of possession; and (3) the property in question is personal property." *Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010). Conversion, being a wrongful and tortious act, cannot originate in the exercise of a legal right, such as the right of execution on a judgment. *Peasley Transfer & Storage Co. v. Smith*, 979 P.2d 605, 616 (Idaho 1999). "Moreover," says the Idaho Supreme Court,

> if possession of property was not acquired by a tortious taking or the possessor does not appropriate or use the property in a fashion to indicate a claim thereto adverse to the owner, then no evidence of a conversion exists until there is proof, first, that a proper demand for possession was made by

---

[7] The Shaws also argue summary judgment on liability would be inappropriate because there are genuine issues of fact on their claims of privilege. "Privilege" is defined by the Restatement (Second) of Torts as "the fact that conduct which, under ordinary circumstances, would subject the actor to liability, under particular circumstances does not subject him to such liability." Restatement (Second) of Torts § 10. Comment *c* suggests the privileges at issue here are affirmative defenses. The Court agrees in part and disagrees in part. To the extent the Becks seek a conclusive finding of liability, leaving only damages for the jury, the Shaws are correct a colorable affirmative defense would preclude the Court from awarding summary judgment on liability simpliciter. However, the existence of a colorable affirmative defense would not defeat a motion for partial summary judgment on the elements of plaintiffs' case in chief. If there is a genuine dispute on an affirmative defense, but not on the case in chief, the proper ruling would be to grant summary judgment on the case in chief and send the issue of the defense to the jury.

the one who is entitled thereto and, second, that the possessor wrongfully refused delivery.

*Id.* at 616–17. "A conversion can result only from conduct intended to affect the chattel. For merely negligent interference with it, such as failure to protect it against loss, damage or theft, the remedy is an action for negligence; . . . ." *Oppenheimer Indus., Inc. v. Johnson Cattle Co.*, 732 P.2d 661, 664 (Idaho 1986)

There is a genuine issue of material fact as to each element of the Becks' case in chief for conversion. First, there is a genuine issue as to whether the Shaws wrongfully gained possession of the Becks' chattels. The Shaws gained physical possession of the Becks' chattels when they obtained ownership of that half of the Property, which Idaho courts have determined was not wrongful in itself. Dkt. 46-1, at 121–22; *see also Shaw*, 2026 WL 1970686, at *14. Ownership of real estate entails, if nothing else, the right to physically control the land, under so much discretion as the law permits. *Herndon v. City of Sandpoint*, 531 P.3d 1125, 1140 (Idaho 2023) (a possessory interest in land entails "a certain degree of physical control over the land") (citing the Restatement (First) of Property § 7). The fact that an owner of property moved the chattel of another will not, without more, qualify as a wrongful taking or a claim averse to the rights of the chattel's owner.

Here, the parties do not indicate the Shaws ever wrongfully rejected a demand for possession, and there are sworn affidavits indicating that the Shaws responded to threats from the Becks by demanding the Becks retrieve their chattels. *See* Dkt. 45-3, at 2. The Court therefore, finds the Becks are not entitled to summary judgment on the first element of their conversion claim.

Additionally, for conversion to lie, a person's exercise of dominion itself must damage or otherwise permanently dispossess the true owner. *See Oppenheimer Indus., Inc.*, 732 P.2d at 664. If the Shaws did not damage the property when they boxed it up, or if they did damage the property but those damages were insufficient to create conversion liability, their allegedly negligent failure to exercise care in storing the boxes cannot create conversion liability.[8]

Although the Shaws do not contest there were some chattels owned by the Becks as personal property, the Court lacks sufficient information to grant summary judgment on precisely which of the Becks pieces of personal property are undisputed.

The Becks are not, therefore, entitled to summary judgment on their case in chief for conversion.

### D. Invasion of Privacy

Finally, the Becks argue there is no genuine dispute of material fact regarding any of the elements of their invasion of privacy (public disclosure of embarrassing facts) claim against Barbara Spade.

"In order to have an actionable claim for public disclosure of private facts, the plaintiff must prove the following three elements: (1) public disclosure, (2) the facts must

---

[8] The Becks argue the Bonner County District Court found they had a right to store chattels on the Property. That is neither relevant nor correct. Even if the Bonner County District Court did make that finding, the fact that someone has a right to store chattels on a property would not necessarily preclude the fee owner from moving another's chattels stored on his property. *See Peasley*, 979 P.2d at 616–17. Regardless, the Becks misinterpret the Bonner County District Court's holding. The District Court found the Becks could not be held liable for trespass for refusing to move their chattels because they based their refusal on color of title. That is not the same thing as holding the Becks had an absolute right to store their chattels on the property.

MEMORANDUM DECISION AND ORDER - 22

be entitled to privacy, and (3) the public disclosure must be offensive and objectionable to a reasonable person." *Berian v. Berberian*, 483 P.3d 937, 949 (Idaho 2020) (citation modified). "[A] public disclosure [does] not occur when the record indicate[s] that only a limited number of persons received the private information and those persons had a right to know the information." *Nation v. State, Dep't of Correction*, 158 P.3d 953, 964 (Idaho 2007).

The Becks argue element one can be satisfied because Spade told the Shaws that Idaho claimed a tax lien against Larry Beck, which she learned when helping Cynthia pull the Becks' credit report. Spade argues there is no evidence she told anyone of Larry Beck's tax lien, and avers she did not show the Shaws the Becks' credit report. Spade further argues that Larry Beck's tax lien is publicly available information and posted on the Idaho Secretary of State's website, so the fact of the lien cannot be entitled to privacy. The Becks reply that Spade cannot deny she showed the Shaws the Becks' credit report under the sham affidavit rule. Plaintiffs also argue there is no admissible evidence Larry's tax lien is visible on the Idaho Secretary of State's website.

a. Sham Affidavit Rule

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). A district court must make two findings to apply the sham affidavit rule. *Id.* at 998–99.

First, the Court must make a factual determination that the second affidavit was a "sham." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991). When the

MEMORANDUM DECISION AND ORDER - 23

declarant clearly recalls events which she could not recall at a deposition, refuses to recall matters which she should naturally know, or offers weak, implausible explanations for the inconsistency, the Court may find a sham affidavit. *Yeager v. Bowlin*, 693 F.3d 1076, 1080–81 (9th Cir. 2012). Second, the Court must find the deposition testimony and declaration are clearly and unambiguously inconsistent. "[M]inor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* at 1081 (quoting *Van Asdale*, 577 F.3d at 999).

Barbara Spade offers a declaration which denies she ever showed the Shaws the Becks' credit report. She had previously testified at a deposition in a way which suggested she may have shown the Shaws the Becks' credit report. But the sham affidavit rule is inapplicable because the deposition testimony and declaration are not clearly and unambiguously inconsistent. During her deposition, Spade was asked questions about the circumstances in which she came to possess Cynthia Beck's credit report, and she was asked leading questions about when she showed DeAnna Shaw the Becks' credit report. There she testified that she "may have" showed DeAnna the credit report, but she is far from decisive. Dkt. 46-1, at 16. It is not clearly and unambiguously inconsistent for her to answer that it was possible she showed the Shaws the credit report at her deposition and deny the same at this juncture.

b. <u>Facts Entitled to Privacy</u>

The Becks next argue Spade cannot evade summary judgment by arguing Larry's tax lien is publicly accessible because she has not presented that fact in an admissible form. But the Becks have the standard backwards. Although Spade has not presented this fact in

MEMORANDUM DECISION AND ORDER - 24

a manner which is itself admissible, in order to obtain summary judgment, the Becks must show Spade's evidence cannot be presented in an admissible form. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Because the Becks have not shown Spade is incapable of submitting evidence that Idaho has publicly recorded a tax lien against Larry in an admissible form, the underlying information can be considered at summary judgment.

Finally, the Becks ask for summary judgment on the issue of whether Spade is liable for the damage to their chattels caused by the Shaws' failure to properly store them. The Becks argue Spade's disclosure of Larry's tax lien caused the Shaws to obtain title to the Property, which in turn caused the Shaws to improperly store the Becks' chattels. Because proximate cause is a mixed question for the jury, and a reasonable jury could find that the Shaws' failure to properly store the Becks' chattels is a superseding and intervening cause for the Becks' losses, the Court denies the Becks' request for summary judgment on Spade's liability for damages to the Becks' chattels. *See Coombs v. Curnow*, 219 P.3d 453, 464 (Idaho 2009) ("The question of proximate cause is one of fact and almost always for the jury.").

The Court, therefore, DENIES the Becks' Motion for Summary Judgment as to Spade's liability.

### V. CONCLUSION

This case has wound its way through the courts for years. With any luck, trial will be its final stage. But because genuine issues of material fact remain as to each of the

MEMORANDUM DECISION AND ORDER - 25

Becks' claims, trial will be necessary. The Shaws' Motion for Summary Judgment is GRANTED insofar as it seeks exclusion of Roger Howson, and the Becks' Motion for Summary Judgment is GRANTED regarding the first two elements of their unjust enrichment claim. In all other respects, the Motions are DENIED.

## VI. ORDER

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Robert and DeAnna Fox Shaw's Motion for Summary Judgment (Dkt. 45) is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED to the extent it seeks exclusion of the testimony of Roger Howson. It is DENIED in all other respects.

2. Rhoda Shaw, Cynthia Beck, and Larry Beck's Motion for Summary Judgment (Dkt. 46) is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED to the extent it seeks summary judgment on the first two elements of Plaintiffs' unjust enrichment claim. It is DENIED in all other respects.

3. The Court will schedule a telephonic scheduling conference in the near future for purposes of selecting a trial date.

DATED: July 30, 2026

David C. Nye
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 26